is Morris and Judith Family Partner versus Fidelity Brokerage Services. Good morning, counsel. Good morning, Your Honor. May it please the court, I'm Jeffrey Schreiber and I represent the appellant, the Morris and Judith Family Partnership, LLC. Your Honors, you should reverse the district court's grant of summary judgment to Fidelity in this case, which was rendered by the district court in a decision in which the district court did not even mention the multitude of facts that are undisputed in the record that show that not only was Fidelity aware that it had permitted an unauthorized signatory to the account to cause Fidelity to release an aggregate value account of approximately $12 million, but that Fidelity- Can't they assume that there's no objection if they hear no objection? Well, Your Honor, they can assume there's no objection if they were not responsible for engineering the disbursement of the proceeds of the account in violation of their own procedures and policies. And when they did it knowing full well, or at least they should have known according to their own policies based on the testimony of their own director of risk, that there was an issue that required them to hold the proceeds in the account. So I agree with you that they arranged the LOI for Judith. And then they did it, and they sent statements every month to the company. And then they hear no objection, and they assume that everyone agrees, or at least the right  So what you're asking, Your Honor, is Fidelity has argued that the reason that it needs and that it has in its customer agreement a requirement that a customer give notice of an error, that's what it's called under at page 970 of the record, that Fidelity says, if you notify us in a timely fashion, we can do something about it. And that's the reason that that notice requirement is there. And the failure to give notice means that you prevented us from being able to do something about it. And they cite a series of cases for the unremarkable proposition that parties are allowed to set up their obligations in the contract, including notice requirements, and that those are like exculpation clauses are enforceable under Massachusetts law. What they do not say is they do not cite a single case in which the party that actually caused the problem, and therefore was aware of the problem, means that they could then take the benefit and the shelter of the notice provision to exculpate them from their own liability for their own conduct. In fact, for example, one of the main cases that they rely on, the Grassy case from Massachusetts, is a case in which there were forged checks. And the bank said, well, there's a notice provision. You have to let us know. And the court looked at the fact that the banks in that situation, number one, had complied with their own policies and procedures, something that did not happen here, and also that the banks had complied with a standard of care with respect to analyzing whether any signatures that they received were forged. The banks there were using some space age signature analysis technology in order to get the bank off. The analysis did not simply end with the notice provision. More importantly here is that we're on summary judgment. And the district court's analysis of what happened is limited to its analysis at pages 11 to 12 of the special appendix, where the court simply held that this section of the customer agreement, interestingly enough, your honors, on the motion to dismiss stage, Fidelity claimed there was no agreement. They found this later and claimed that this agreement barred the claims. They said that the district court said the notice provision was an absolute bar without even looking at any of the multitude of undisputed facts in the record that demonstrate that at least on the inferences that we're entitled to under summary judgment, that Fidelity not only was aware but actually engineered its own problem here and then turned around to set up as a shield for its own misconduct, the notice provision. By the way, the customer agreement also says that Fidelity has responsibilities. At page 1471 of the record, it says that it will execute orders subject to our acceptance of an authorized order. And there's no dispute here that Fidelity's own internal people recognized that this order was not authorized, whether by law or under its own procedures. Let me ask you. Let me ask you. Go ahead. Let me ask you. Judith had been given permission to trade and sell stock, hadn't she, in the LLC? Yes, she had, Your Honor. What if she'd simply sold all the stock? Well, there were limits even under the authority that she was given when she was listed as an authorized person. There were limits on the authority that she was given. So she met the limit every time and ultimately took all the value out of the LLC. She had the authority to do that, didn't she? Actually, no, Your Honor. She did not. What I don't really understand is she's the only living member of the LLC, right? So there were two members. She is the only surviving member. But the other 50%- And the surviving spouse. And she is a surviving spouse. The estate files a tax return saying that she owns that asset, right? The estate filed those returns, Your Honor. So I don't understand. I mean, maybe it's just the fact that I practice law in upstate New York. But who inherited this interest? Who inherited Morris's interest? Well, Your Honor, Morris's interest- Simple question. Just tell me who inherited this interest. It passes to the estate and has to be distributed through the estate. And in the estate, did she take and Richard take? The estate is not resolved yet, Your Honor. In fact, it's a subject of- Tell me what the distribution is supposed to be. You know what the distribution is. Don't tell me that it's not settled yet.  That's my question. I'm sorry, Your Honor. I believe the distribution is to be one third to each of the children after Judith. After Judith, okay. Yes. All right. But she gets the bulk of the estate in any event as the surviving spouse and part owner of the original account. Yes. Assuming, by the way, we never even got to the issue of whether in fact she actually is a part owner. At the motion to dismiss stage, the district court held that she was. But there was a fact issue on that as well, Your Honors, because she had never signed the LLC operating agreement. There's no record of her doing so. And all of the money, it is undisputed, came from Morris's own individual funds. We never- They were married. It didn't come from his individual account. It came from the joint account  No- Domestic relations law for a long time, counsel. Yes, but the source of it, and Judith said she had no idea that it was being funded, or in fact that the partnership was actually even being formed, that's her testimony on deposition. So the real issue here is on summary judgment. Forget the issue of whether my client is entitled to summary judgment, but whether Fidelity was entitled to summary judgment. Where Fidelity's own risk manager says that when they have any inkling that there's an issue, they will freeze an account and not permit any withdrawals from the account. Here- Counsel, the arguments, I understand that you're trying to shift this to a factual argument, but the question that's presented to us by the district court ruling is whether this one provision in the contract trumps everything.  then you can't hold us liable. So we can have all the facts that you want preceding whatever that period of time, we can have earthquakes and floods, and we can have all sorts of things, but if no notice, or if notice is provided and nobody complains to Fidelity, the question is, does that contractual provision trump? That's the operative question. And if our answer is no, that all the predicate facts matter, and this is not the governing language of the contract, and I suppose we engage in your argument, but if we agree with your adversary and the district court and say, look, whatever came before doesn't matter because there's an enforceable contract provision, then the game's up for you, right? Your honors, if you do find that, then it is. I'm out of time, so- No, I appreciate it. You have reserved one and a half minutes for rebuttal. Thank you, counsel. Fidelity? Thank you, your honor. It may please the court. Daniel Tabak from Cohen & Gresser on behalf of Fidelity Brokerage Services. As Judge Rakoff recognized in deciding an earlier motion in this case, this dispute arises from a battle between a son and his mother with Fidelity caught in the middle. There's no, this is also a case where there's no dispute as to any of the material facts, which we've laid out in our brief. Fidelity has five defenses to liability, but I'll focus on the one issue that the court has raised and the appellant has raised in the oral argument. It is a matter of law that Fidelity's provision, the notification provision in its contract applies whether or not Fidelity was involved in, engineered, which is not actually the case, or knew that there was something going on in the account. Counsel for appellant cited the Grassi case. In fact, in the Grassi case from Massachusetts, there were two banks at issue. One bank had a similar, an exculpation clause. If the customer didn't notify within 30 days, then the customer could not bring a claim. The other one had a staged clause that said if it's within a certain time period, it depends whether ordinary care was done. If it's beyond that time period, it doesn't matter if there was ordinary care. The Grassi court did not look into whether either bank had any knowledge. It simply applied the contract as written. And that's what Fidelity is asking you to do here. And that's what Judge Rakoff did, apply the contract as written. And I think that there's clearly no dispute as to the facts that the partnership here had ample notice of seven transfers before the transfer that they're complaining about. They had ample notice of the transfer that they are complaining about. And Richard, who's purporting to act as co-manager, who's a lawyer, by the way, purporting to act as co-manager of the partnership. We won't hold that against. I hope you don't hold it against me either, Your Honor. I certainly don't hold it against my colleague at the bar, Mr. Schreiber. My brother's proud of him. Go ahead. He not only knew, he engaged in a conversation with Fidelity where he said that the account was emptied out. And not even during that conversation did he say something improper or untoward had happened. Yeah, instead, actually a month later, he has another conversation with Fidelity. And although he now says, and he says his mother was a thief, he lets Fidelity increase her access to another account. He was giving her checks to deposit into the Fidelity account. It's clear that he knew that this was her account. So- But the question is what, you know, Fidelity's got this notice provision so that if somebody hacks into my account at Fidelity, I have a change of plans, but Fidelity, somehow somebody hacks into it and starts trading on my account. I get a notice of a trade. Something's up. Fidelity's got hundreds of thousands of accounts. But this is a little different, isn't it? This is a Fidelity employee assisting someone in doing something that the paperwork that governs the account doesn't allow for which Fidelity at least ought to be on notice in that regard. Let's look actually at the specific facts of what happened here. Well, then- Fidelity ends up gaining on this, didn't it? Fidelity ends up getting all this money into another trading account that Judith's gaining on. They're facilitating the opening of an account and contravention of the LLC paperwork, aren't they? So in fact, Judge Wesley, if Judith was not allowed to transfer money out of the first account, the money would have stayed at Fidelity anyway. So Fidelity didn't gain anything by moving it from one account at Fidelity to another. The real situation here is it's not at all unusual for an elderly widow like Judith to have trouble. Judith wanted to trade and she wanted access and they were trying to facilitate her being happy with them. Isn't that, to some degree, what the facts show in this case? Well, even under the full trading authorization, she could still trade in the partnership account. She was still perfectly able to do that. Yeah, but the paperwork shows that the question arose, how do we get this money out of this so that she has access to it and it's all in her name, right? Well, she wanted to do a variety of different things. One thing she wanted to do was add a different son as a beneficiary on the account. Right. And Fidelity said, well, no, that's not something that can be done in a corporate account. You had a change in plans, as Fidelity would say. Well, the original plan for opening the new account and transferring money actually came from her own lawyer. And it's at the record at page 2031 that her lawyer was the one who suggested this. This was not something Fidelity, it's not something Fidelity engineered on its own. They were trying to help an elderly widow who was having trouble figuring out how to deal with the account. And so that's the factual circumstance here. But the law is, again, it's under the contract. The court can also look at ratification. The court has used ratification as an alternative grounds in VKK Corporation. Hypothetically, counsel, hypothetically, if when Judith first started transferring money from the company account to her own account and Richard said, what's going on? Called you immediately. What action could you have taken? Sure, the Gray Declaration from Fidelity's Risk Management Department's at the record, it's at pages 949 to 950. Angela Gray says that what Fidelity does every time that happens, if the customer notifies them of an issue, is that they restrict transfers out of the account. They may also freeze the account entirely, no trading. And if they are able to, if money has moved out of the account, they will, if they're able to, they will, or assets moved out of the account, they will move it back. That's in the record at pages 949 to 950. We also know from what actually happened as this played out, Fidelity first learned, and well over a year later, in March of 2016, Fidelity first learned that Richard was disputing this. And in the records at page A25 of 29, it's the declaration of Kathleen DiGennaro, DiGennaro, oh, excuse me. Fidelity immediately froze Judith's account upon learning that there was a dispute. So it's not entirely hypothetical, Judge Pooler, as to what Fidelity would have done. We know what Fidelity would have done. They would have restricted the account so that Judith couldn't transfer funds out. They would have frozen it. And so had Richard just said anything after any of the first seven transfers, so more than $125,000 transferred out, not a pocket change here. This is a lot of money going in. There should be, under Richard's theory, no other activity in this account. So if he sees a statement, looks at the account online, as he said he had told his father he would do, if he sees anything happening on the account, and he believes that his mother's not allowed to do it, any reasonable person under those circumstances, reasonable customer would have told Fidelity, wait a second, in all he had to do, it's not a tough haul, pick up the phone and dial the 1-800 number. It's not even, it's a free call, and just say, what's going on? I didn't authorize these transactions. And we know that under those circumstances, Fidelity would have frozen the account. The other issue I wanna raise, and Judge Wesley raised this, is the issue of whether it's called quasi-estoppel or tax estoppel. In this case, the estate filed the tax return in 2015, saying that Judith solely inherited this account, and that therefore it was exempt from the estate tax. The estate was one of the two initial co-plaintiffs in this case, took an entirely irreconcilable position that Judith is not even a member of the Morris and Judith family partnership, which appellant still insists on, even though her name appears twice in the initial operating agreement. So the estate takes this position on the tax returns and takes an entirely irreconcilable position here. This is a classic case of tax estoppel or quasi-estoppel. The fact that the estate was dismissed is of no moment because the partnership is representing its interests here. And that was part of the reason why the estate was dismissed. It didn't have standing since the partnership was representing it. Sue. You settled your case with Judith, your separate case? We did settle the separate case with Judith, Your Honor. Sue. If there are no further questions from the panel, I'll just sum up that I think the district court clearly got this decision correct, and we respectfully request  Thank you, counsel. Thank you, Your Honor. I'm sure you've retained a minimum amount, very precise. Thank you, Your Honor. Just several short points. First of all, the tax estoppel argument, we didn't get to it when Judge Wesley first raised it, doesn't apply here because this is a separate entity from the estate and Richard's brother, Robert. And by the way, when Mr. Tabak said that what Judith was trying to do when it spoke to Fidelity's representatives was add Robert to the account, he left out the part where Judith also told Fidelity that she wanted to remove Richard from the account. This is a huge family dispute, unfortunately. So that tax return by the estate was contested immediately by Richard, who said it was improper and incorrect. And if we're gonna talk about taxes, there are tax returns in the record that show that Judith herself never claimed an interest in this partnership that she now says was hers. So that's on the tax estoppel issue. The other issue is, Judge Wesley, you put your finger on it when you talked about the facts from the standpoint of a decision on summary judgment. The issue here was not whether ultimately what's gonna happen. The issue here is based on the inferences to which the LLC is entitled at the summary judgment stage, where after more than three months had elapsed and Judith was unable to deliver Richard's signature despite at least three separate instructions from Fidelity that that's what she needed to have in order to accomplish what she wanted, Fidelity at that time did not freeze the account. And while Mr. Tabak points to Ms. Gray's declaration, what Ms. Gray actually said is that Fidelity's policies require that where there is even a colorable dispute, where Fidelity gets knowledge that there's something brewing that's even colorable, they have to freeze it then. So the funds were ultimately not dispersed until April of 2017. But at that point, they were already in Judith's account and therefore they could not be frozen. The issue here is Fidelity trying to use- Why couldn't they have been frozen in Judith's account? I'm sorry? Why couldn't they have been frozen in Judith's account? But that's not the issue. Fidelity did freeze it in Judith's account. Your Honor, this is, if I may, there was a dispute in the surrogate's proceeding. I don't believe this is in the record, but the court can take judicial notice of it. There was a freeze on that account for a period of time. And the surrogate essentially said, I'm dissolving the freeze because Fidelity, Fidelity made an interpleader motion trying to pay the money that was in Judith's account into the surrogate's court. And the surrogate rejected that application saying, look, Fidelity did whatever Fidelity did. That's between Fidelity and the LLC, but Fidelity cannot freeze Judith's account. So there is no evidence in the record of actually here, had Fidelity been able to take- The horse was already out of the barn. That's the issue. And Fidelity was the one that was standing there holding the latch open, letting the horse out. Under those circumstances, to allow a notice provision where Fidelity put in its contract that if it has notice, that there's a requirement that there be notice where not only did it have notice, but it conspired with the unauthorized person and the allegations about, well, she's an elderly widow trying to get access to the account. But that inference we're entitled to. We're entitled to the inference on Fidelity's summary judgment motion that Fidelity knew full well. In fact, what it called it was assets at risk. That's the way when Judith complained about the $35 per trade fee, that's the way their account executive qualified it. And from then on, they went to ensure, as Judge Wesley noted, that they continue to hold these assets in Fidelity in breach of their contractual obligations due to the LLC. If your honors have no further questions. Thank you, counsel. Thank you both for reserved decisions. Very nice argument.